UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAMIKA YOUNG, as parent and natural guardian of J.Y., a minor,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA; HEATHER CRAWFORD, D.O.; SHAURIN PATEL, M.D.; BEVERLY E TEW, M.D.; and COOPER UNIVERSITY HOSPITAL,<br><br>Defendants. | Civil. No 12-5215 (RBK/AMD)<br><br>**OPINION** |

**KUGLER**, United States District Judge:

This lawsuit for medical malpractice under the Federal Tort Claims Act stems from the care and treatment of Plaintiff Tamika Young ("Young") during the end of her pregnancy and delivery of J.Y., her child. Young was treated at Cooper University Hospital ("CUH") by doctors employed by CUH (collectively, the "Cooper Defendants"), and by doctors employed by CAMcare Health Corporation ("CAMcare"). This matter comes before the Court on Defendant United States (the "Government")'s Motion for Partial Summary Judgment ("Government's Motion" [Dkt. No. 115]) on the basis that the Government is entitled to a cap on damages based on the New Jersey Charitable Immunities Act ("NJCIA"), N.J.S.A. 2A:53A–7, et seq. For the reasons that follow, the Government's Motion will be **GRANTED**.

I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court previously set forth the factual background in its Opinion of December 2, 2015 [Dkt. No. 104], reported at *Young v. United States*, --- F. Supp. 3d ---, 2015 WL 9592442 (D.N.J.

1

Dec. 2, 2015) ("*Immunity Opinion*").  The facts that are relevant to deciding the Government's Motion are recited again here.  As this is a motion for summary judgment, all inferences are drawn in favor of Young, the non-moving party.  *Trinity Indus, Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 134–35 (3d Cir. 2013).

Young was treated by five doctors while at CUH due to complications from her pregnancy on April 6–7, 2009.  *Immunity Op.*, 2015 WL 9592442, at *1.  Three were employees of CUH, and two were employees of CAMcare, a federally qualified health center ("FQHC").  *Id.*  Ultimately, Young's child, J.Y., suffered a brain bleed, has a permanent heart murmur, and has been diagnosed with cerebral palsy.  *Id.*

Young timely filed this suit against the Government on August 20, 2012 for the actions of the CAMcare employees, and the Cooper Defendants were added to the case on February 12, 2014.  *Id.* at *2.  The Government then moved to dismiss the complaint on jurisdictional grounds, arguing for absolute immunity under the NJCIA or, in the alternative, entitlement to the damages cap of the NJCIA if it was not entitled to absolute immunity.  *Id.*

The Court determined that the Government was not entitled to absolute immunity under the NJCIA, because CAMcare was organized exclusively for hospital purposes.  *Id.* at *8–10.  The Court then deferred judgment on the Government's request to limit damages pursuant to the damages cap provision of the NJCIA for hospitals, provided by N.J.S.A. 2A:53A-8, and permitted discovery on the issue.  *Id.* at *10–11.  The Government has now renewed its motion, requesting that potential damages be limited to $250,000 under the NJCIA.  (*See generally* Gov't Mot. Br. [Dkt. No. 115-1].)  Young has opposed, but the Cooper Defendants have not.

In order to determine the applicability of the damages cap provision of the NJCIA, a discussion of what CAMcare is and how it provides services is necessary.  CAMcare was

originally part of the residency program at CUH. (Gov't Statement of Material Facts ("Gov't SMF") [Dkt. No. 115-2] ¶ 2; Pl. Statement of Material Facts ("Pl. SMF") [Dkt. No. 116] ¶ 2.) CAMcare provides a variety of medical services, and bills through its billing department. (Gov't SMF ¶¶ 4, 6; Pl. SMF ¶¶ 4, 6.) CAMcare was classified as a public charity under I.R.C. §§ 509(a)(1) and 170(b)(1)(A)(vi) in July 1978 and made tax exempt pursuant to I.R.C. § 501(c)(3). (Kellmayer Decl. [Dkt. No. 81-8] ¶ 4; CAMcare 501(c)(3) Letter [Dkt. No. 81-9].) Subsequently, in 1996, CAMcare became an FQHC, and has been an FQHC continuously since then. (Bryant Decl. [Dkt. No. 81-3] ¶ 5; FQHC Deeming Letters [Dkt. No. 81-5].)

In 2009, the year of Young's hospitalization, CAMcare served 32,480 patients. (Gov't SMF ¶ 7; Pl. SMF ¶ 7.) That same year, CAMcare made a profit of $548,159. (Pl.'s Opp. [Dkt. No. 117] at 5;[1] Gov't Counterstatement of Material Facts ("Gov't CSMF") [Dkt. No. 118-1] at 3.) CAMcare's employees received bonuses in 2009, and bonuses were paid to employees where there was sufficient surplus income to do so. (Pl.'s Opp. at 5; Gov't CSMF at 3.) Profits were also reinvested into CAMcare's business operations and expansion. (Pl.'s Opp. at 5; Gov't CSMF at 3.)

## II. JURISDICTION

Young brings state law tort claims against the United States government, seeking to invoke jurisdiction pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–2680, and state law claims against the Cooper Defendants. It is undisputed that the two

---

[1] Plaintiff included a Counterstatement of Material Fact in the body of her brief in direct contravention of the dictate of Local Civil Rule 56.1(a) which states, "Each statement of material facts *shall be a separate document (not part of a brief)*." L.Civ.R. 56.1(a) (emphasis added). This was after Plaintiff was warned by the Court that strict compliance with the Local Civil Rules was required going forward and that "further failure to comply with the Local Rules may result in sanctions for [counsel] and their clients." *Immunity Op.*, 2015 WL 9592442, at *13. This is the last warning counsel will receive in this matter.

doctors employed by CAMcare, by nature of working at CAMcare, an FQHC, are "deemed to be . . . employee[s] of the Public Health Service" and as such "[t]he remedy against the United States . . . shall be exclusive." 42 U.S.C. § 233(g)(1)(A); *see also* 42 U.S.C. § 233(a).

Accordingly, this Court has jurisdiction over the FTCA claim pursuant to 28 U.S.C. § 1346(b), and exercises supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

### III. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the Court weights the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322–23. A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 252. Even if the facts are undisputed, a disagreement over what inferences may be drawn from the facts precludes a grant of summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996). Further, "any unexplained gaps in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion

for summary judgment." *Id.* (quoting *Ingersoll-Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir. 1990)) (internal quotations and alterations omitted).

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter. *Anderson*, 477 U.S. at 249.

### IV. DISCUSSION

Under the NJCIA, the $250,000 damages cap applies where the entity is (1) a nonprofit corporation, society, or association; and (2) organized exclusively for hospital purposes. N.J.S.A. 2A:53A-8. Additionally, in order for the NJCIA damages cap to be applied in a particular case, (3) the organization must have been "promoting those objectives and purposes at the time the plaintiff was injured" and (4) the "plaintiff [must have been] a beneficiary of the activities of the hospital." *Kuchera v. Jersey Shore Family Health Ctr.*, 221 N.J. 239, 249 (2015) (citing *Hardwicke v. Am Boychoir Sch.*, 188 N.J. 69, 95 (2006)).

The Government has briefed all four elements, (*see* Gov't Mot. Br. at 20–31), but it is readily apparent from the responsive briefing that the extent of the dispute before the Court is whether CAMcare is a nonprofit corporation, society, or association within the meaning of the statute. Plaintiff has not responded to or challenged the argument made by the Government regarding the last two elements, and the Court has already determined that CAMcare is organized exclusively for hospital purposes. *See Immunity Op.*, 2015 WL 9592442, at *10 (finding that CAMcare "can be nothing other than an organization that is 'exclusively for

hospital purposes'"). Thus, the only issue is whether CAMcare is a "non-profit corporation, society or association." N.J.S.A. 2A:53A-8.

For the reasons that follow, the Court determines that CAMcare is a nonprofit corporation within the meaning of the NJCIA, and accordingly finds that the Government is entitled to limit its potential damages to $250,000.

### A. Standard for Determining Nonprofit Status

In the context of the NJCIA, it does not appear that the New Jersey courts have directly addressed the issue of what makes an organization a nonprofit. As pointed out by the Government, "courts have generally accepted a declaration from an employee of the non-profit entity with knowledge of that status, as well as documentation supporting that contention." (Gov't Mot. Br. at 20 (citations omitted).) Indeed, another judge in this district has accepted as evidence of non-profit status a certification from a director of risk management who certified that the hospitals in question were organized as nonprofits and continued to be organized as such, accompanied by articles of incorporation that identify that the entities are organized in a charitable manner under I.R.C. §§ 501(c)(3) and 509(a)(1). *Hottenstein v. City of Sea Isle City*, 981 F. Supp. 2d 292, 295 (D.N.J. 2013); *see also Mottola v. City of Union City*, Civ. No. 05-3964 (DMC), 2006 WL 2177405, at *2 (D.N.J. July 31, 2006) (accepting two affidavits for non-profit status). The New Jersey courts that have addressed the issue appear to agree with this standard for determining whether an entity is a non-profit. *See, e.g.*, *Kuchera*, 221 N.J. at 243–44 (accepting without challenging organization as a nonprofit organization within the meaning of I.R.C. § 501(c)(3)); *Hehre v. DeMarco*, 421 N.J. Super. 501, 507–08 (App. Div. 2011) (accepting certificate of incorporation identifying the schools as a nonprofit under I.R.C. § 501(c)(3)).

The other New Jersey cases dealing with whether an organization is a non-profit have all focused on the fact that school boards and hospitals owned and operated by a municipality do not qualify as non-profits under the NJCIA. *See, e.g.*, *Tonelli v. Bd. of Educ. of Twp. of Wyckoff*, 185 N.J. 438, 445 (2005) (school board is an instrumentality of the state and therefore not a non-profit); *Winters v. City of Jersey City*, 63 N.J. 7, 7 (1973) (hospital owned and operated by a municipality is not a non-profit); *Gerber ex rel. Gerber v. Springfield Bd. of Educ.*, 328 N.J. Super. 24, 39–40 (App. Div. 2000) (school board is not a non-profit and not entitled to NJCIA immunity, therefore members of school board are not entitled to NJCIA immunity); *Hamel v. State*, 321 N.J. Super. 67, 76 (App. Div. 1999) (relying on *Winters* to find that a school board is not a non-profit).

What is clear from the New Jersey case law, however, is that the requirement of being a non-profit is clearly a separate inquiry from the purposes of the organization. *See Graber v. Richard Stockton College of N.J.*, 313 N.J. Super. 476, 481 (App. Div. 1998) ("The first condition [of NJCIA immunity] is that *only* a *nonprofit* corporation, society or association is within the purview of the immunity granted by the statute. Whether a corporation, society or organization is 'nonprofit' is a separate question from whether or not the entity is also a 'charity' or organized for 'charitable' purposes."); *see also O'Connell v. State*, 171 N.J. 484 (2002) (citing *Graber* with approval to find that a state college would be covered by the NJCIA). Then, as part of the analysis of whether the organization is a charity, its nonprofit status is a relevant, non-dispositive factor. *Id.* at 481 n.4.

Young urges this Court to take a more searching view of what it means to be a nonprofit, and in effect extrapolate the analysis of what it means to be a "charity" or organized for "charitable purposes" under the absolute immunity provision of the NJCIA with the meaning of

7

"non-profit corporation, society or association" for the purposes of the damages cap.  (*See* Pl.'s Opp. at 7–15.)  Young cites to *Parker v. St. Stephen's Urban Dev. Corp., Inc.*, 243 N.J. Super. 317, 324–25 (App. Div. 1990) for the proposition that evaluating whether CAMcare qualifies under the NJCIA as a non-profit should not end with its 501(c)(3) status.  However, what *Parker* holds is that 501(c)(3) status is not dispositive of whether an organization is a *charity*, and makes no mention of how to determine whether an organization is a *non-profit*.  *Parker*, 243 N.J. Super. at 324–25.  The remainder of the analysis in *Parker* makes clear that the case focused on determining whether an organization that is otherwise a non-profit may claim it is organized for "charitable purposes" and entitled to absolute immunity under the NJCIA.  *See id.* at 325–28.

Young also argues that the policy of the NJCIA mandates expanding the inquiry.  (*See* Pl's Opp. at 8–12.)  It is true, as Young points out, that the NJCIA was enacted to restore charitable immunity as it existed at common law.  *Tonelli v. Bd. of Educ.*, 185 N.J. 438, 443–44 (2005).  And it is also true that "[t]he original point of the [charitable immunity] doctrine was to avoid diverting charitable trust funds to non-charitable purposes in order to live up to the reasonable expectations of the benefactor."  *Parker v. St. Stephen's Urban Dev. Corp.*, 243 N.J. Super. 317, 321 (App. Div. 1990).  However, New Jersey courts have made clear that "the purposes underlying charitable immunity are broader than simply preserving charitable trust funds and include the encouragement of altruistic activity."  *Ryan v. Holy Trinity Evangelical Lutheran Church*, 175 N.J. 333, 341 (2003) (collecting cases).  Indeed, the New Jersey Supreme Court in *O'Connell* considered and rejected this policy argument made by Young, relying on the plain language of the statute and the instruction of the legislature as codified in N.J.S.A. 2A:53A-10 to "liberally construe[ ]" the NJCIA, rather than relying on legislative intent to restore charitable immunity as it existed at common law.  *O'Connell*, 171 N.J. at 492–97.

Finally, Young also suggests that CAMcare's sources of income and revenue distribution serve to convert CAMcare from a non-profit into a for-profit entity. (*See* Pl.'s Br. at 13–15.) This argument, too, has been rejected by the New Jersey Supreme Court in *O'Connell*. With respect to Young's arguments regarding revenue distribution, the Court feels compelled to clarify that there is no "dispute of material fact over how CAMcare's profits were distributed" as Young alleges. (Pl.'s Opp. at 14.) Young asserts that CAMcare has somehow hidden exactly how the organization reinvests it profits and determines how bonuses were given. (*Id.* at 5, 14–15.) To the extent the information remains unknown, the fault lies with Young and her counsel, and the Court will not read in some nefarious motive on the part of CAMcare in its revenue distribution. Young was given two months to conduct discovery exclusively on the issue of whether the damages cap of the NJCIA would apply to CAMcare, *Immunity Op.*, 2015 WL 9592442, at *10–11, and took the opportunity to depose Dr. Sharon Buttress, the recently retired Executive Vice President and Chief Medical Officer for CAMcare (Gov't SMF ¶ 1). If Young's counsel during that deposition did not sufficiently question Dr. Buttress, Young cannot now assert that CAMcare has hidden the answer. Indeed, it was counsel for the Government—and not Young—who actually elicited details of how profits were reinvested into operations or expansions while counsel for Young focused on the bonus structure of CAMcare. (*Compare* Buttress Dep. [Dkt. No. 115-4] 21:12–23:15 (questioning by Mr. Layser regarding bonus structure) *with id.* at 45:18–46:9 (questioning by Mr. Gibbons regarding operations and expansion reinvestment).) Regardless, there is no evidence of improper bonuses or improper reinvestment of profits, and it is not expected that a nonprofit must "lose money or at least do no better than break even." *Paper Mill Playhouse v. Millburn Twp.*, 95 N.J. 503, 522–23 (1984),

*superseded in part by statute as recognized by Int'l Schs. Servs., Inc. v. W. Windsor Twp.*, 207 N.J. 3, 16 (2011).[2]

In light of *Graber*, the Court finds that to go beyond assessing the nonprofit status of CAMcare under the Internal Revenue Code in determining whether or not CAMcare is a "non-profit corporation, society or association" under the NJCIA is inappropriate. No New Jersey court has held that the inquiry goes deeper, and nothing cited by Young actually addresses the prong of "non-profit corporation, society or association." Rather, the cases cited by Young deal with the issue of whether an organization is a "charity" or organized for "charitable purposes" under the absolute immunity provision of the NJCIA or whether activity in a building owned by a non-profit may be used for for-profit purposes and thus lose immunity under the NJCIA or face loss of local property exemption—both irrelevant issues here.

### B.       CAMcare is a Non-Profit Organization

The Court begins and ends its analysis with the fact that CAMcare is organized as a nonprofit corporation and has been granted nonprofit status by the Internal Revenue Service, as explained above. There is no dispute that CAMcare is tax exempt under I.R.C. § 501(c)(3) and classified as a publicly supported organization under I.R.C. §§ 509(a)(1) and 170(b)(1)(A)(vi). Additionally, CAMcare's governing documents refer to its 501(c)(3) status, explain that it is organized as a non-profit corporation, and further provide that its sources of income will be charitable contributions, government and charitable grants, and fees for services provided. (CAMcare Bylaws [Dkt. No. 81-6] at 3.) As such, CAMcare is a "non-profit corporation, society

---

[2] The *Paper Mill Playhouse* test dealt with whether a non-profit was exempt from local property taxes. The test and standards for dealing with exemption from local property taxes are generally inapplicable here, but the Court finds this holding relevant when addressing Young's allegations of improper bonuses and capital reinvestment only.

or association" within the meaning of the NJCIA. Accordingly, CAMcare and the United States are entitled to the $250,000 damages cap under the NJCIA, N.J.S.A. 2A:53A-8, and the Government's Motion will be granted.

## V. CONCLUSION

For the foregoing reasons, the Government's Motion will be granted, and the potential liability of the United States will be limited to $250,000. An appropriate order accompanies this opinion.

Date: June  2nd , 2016

                                             s/Robert B. Kugler
                                             ROBERT B. KUGLER, U.S.D.J.